UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| DAVID P.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2:23-cv-00208-MJD-JRS |
| | ) |
| MARTIN O'MALLEY,[2] | ) |
| | ) |
| | ) |
| Defendant. | ) |

**ENTRY ON JUDICIAL REVIEW**

Claimant David P. requests judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. *See* 42 U.S.C. § 1382. For the reasons set forth below, the Court **REVERSES** the decision of the Commissioner.

**I.  Background**

Claimant applied for SSI in September 2020, alleging an onset of disability as of July 1, 2020.  [Dkt. 13-5 at 4.]  Claimant's application was denied initially and again upon

---

[1] In an attempt to protect the privacy interest of claimants for Social Security benefits, consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States Courts, the Southern District of Indiana has opted to use only the first name and last initial of non-governmental parties in its Social Security judicial review opinions.

[2] Pursuant to Federal Rule of Civil Procedure 25(d), Martin O'Malley automatically became the Defendant in this case when he was sworn in as Commissioner of the Social Security Administration on December 20, 2023, replacing Acting Commissioner of the Social Security Administration Kilolo Kijakazi.

reconsideration, and a hearing was held before Administrative Law Judge Gladys Whitfield ("ALJ") on March 1, 2022. [Dkt. 13-2 at 54.] On July 12, 2022, ALJ Whitfield issued her determination that Claimant was not disabled. *Id.* at 11. The Appeals Council then denied Claimant's request for review on February 21, 2023. *Id.* at 2. Claimant timely filed his Complaint on April 25, 2023, seeking judicial review of the ALJ's decision. [Dkt. 1.]

## II.  Legal Standards

To be eligible for benefits, a claimant must have a disability pursuant to 42 U.S.C. § 423. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

To determine whether a claimant is disabled, the Commissioner, as represented by the ALJ, employs a sequential, five-step analysis: (1) if the claimant is engaged in substantial gainful activity, he is not disabled; (2) if the claimant does not have a "severe" impairment, one that significantly limits his ability to perform basic work activities, he is not disabled; (3) if the claimant's impairment or combination of impairments meets or medically equals any impairment appearing in the Listing of Impairments, 20 C.F.R. pt. 404, subpart P, App. 1, the claimant is disabled; (4) if the claimant is not found to be disabled at step three, and is able to perform his past relevant work, he is not disabled; and (5) if the claimant is not found to be disabled at step three, cannot perform his past relevant work, but can perform certain other available work, he is not disabled. 20 C.F.R. § 416.920(a)(4). Before continuing to step four, the ALJ must assess the claimant's residual functional capacity ("RFC") by "incorporat[ing] all of the claimant's limitations supported by the medical record." *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019)

2

(citing *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015)). If, at any step, the ALJ can make a conclusive finding that the claimant either is or is not disabled, then she need not progress to the next step of the analysis. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

In reviewing a claimant's appeal, the Court will reverse only "if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020). While an ALJ need not address every piece of evidence, she "must provide a 'logical bridge' between the evidence and [her] conclusions." *Varga*, 794 F.3d at 813 (quoting *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010)). Thus, an ALJ's decision "will be upheld if supported by substantial evidence," which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). This Court may not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Where substantial evidence supports the ALJ's disability determination, the Court must affirm the decision even if "reasonable minds could differ" on whether the claimant is disabled. *Id.*

### III.  ALJ Decision

ALJ Whitfield first determined that Claimant had not engaged in substantial gainful activity since the application date of September 2, 2020. [Dkt. 13-2 at 14.] At step two, the ALJ found that Claimant had the following severe impairments: "degenerative disc disease of the cervical spine; pernicious anemia due to vitamin B12 deficiency; chronic kidney disease; and diabetes mellitus." *Id*. at 14. At step three, the ALJ found that Claimant's impairments did not meet or equal a listed impairment during the relevant time period. *Id.* at 16. The ALJ then found that, during the relevant time period, Claimant had the residual functional capacity ("RFC")

>to perform light work as defined in 20 CFR 416.967(b) except that he: can never climb ladders, ropes, and scaffolds; can occasionally climb ramps or stirs [sic], balance, stoop, kneel, crouch, or crawl; must avoid use of hazardous moving machinery as well as exposure to unprotected heights, open flames, and large bodies of water; and cannot perform a job where driving or operating a motorized vehicle is necessary to perform the functions of the job.

*Id.* at 17.

At step four, the ALJ found that Claimant was able to perform his past relevant work as a product assembler during the relevant time period. *Id*. at 22. She alternatively found at step five that there were other jobs that exist in significant numbers that Claimant could perform, including cashier, cleaner, merchandise marker, furniture rental clerk, and storage rental clerk. *Id.* at 23. Accordingly, ALJ Whitfield concluded Claimant was not disabled. *Id.* at 24.

## IV.  Discussion

Claimant raises three issues, each of which is addressed, in turn, below.

### A.  ALJ's Consideration of Claimant's Fatigue

The ALJ recognized that "[d]uring the administrative hearing, the claimant testified that he is unable to work due to fatigue and difficulty walking.  He noted that he has experienced regular falls and gets tired quickly."  [Dkt. 13-2 at 18.]  Claimant also testified at the hearing that he requires a nap "almost every day" for "about an hour" due to his fatigue.  [Dkt. 13-2 at 75.]

Claimant argues that the ALJ failed to properly consider Claimant's subjective symptom of fatigue when arriving at her RFC determination.  For the reasons set forth below, the Court disagrees.

When making an RFC determination, the ALJ "will assess [a claimant's] residual functional capacity based on all of the relevant medical and other evidence." 20 C.F.R. 404.1545(a)(3).  As is required by 20 C.F.R. § 404.1529, the ALJ must utilize a two-step test to

evaluate a claimant's subjective symptoms, beginning by evaluating whether the claimant has a medically determinable impairment. 20 C.F.R. § 404.1529(b)-(c); SSR 16-3p, 2017 WL 5180304, at *4. For an impairment to be medically determinable, medical signs and laboratory findings must show the existence of the impairment and that impairment must reasonably be expected to produce the symptom(s) alleged. SSR 16-3p, 2017 WL 5180304, at *3.

If the ALJ concludes that there is a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms, she must then evaluate the intensity and persistence of those symptoms to determine the extent to which they limit the claimant's work capacity. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304, at *4-5. In making such an evaluation, the ALJ must consider several factors, including (i) daily activities; (ii) the location, duration, frequency, and intensity of pain or other symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (v) treatment the claimant receives or has received for relief of pain or other symptoms; (vi) any measures the claimant uses or has used to relieve pain or other symptoms and (vii) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3)(i)-(vii); SSR 16-3p, 2017 WL 5180304, at *7-8. This symptom-based analysis requires the ALJ to evaluate statements made by the claimant regarding those symptoms. SSR 16-3p, 2017 WL 5180304, at *6. However, the ALJ is also required to determine whether those statements made by the claimant are consistent with the medical signs and laboratory findings in the record. *Id.* at *5.

Claimant is correct that he has a severe impairment, pernicious anemia, that can cause fatigue. The ALJ did not find otherwise; indeed, she found that claimant's medically

5

determinable impairments could reasonably be expected to cause the symptoms alleged by Claimant. However, the ALJ did not fully credit Claimant's allegations with regard to the "intensity, persistence and limiting effects" of those symptoms. [Dkt. 13-2 at 19.]

With regard to the symptom of fatigue, the ALJ recognized that Claimant experienced "significant fatigue and weakness in July of 2020," was hospitalized from August 10, 2020, to September 3, 2020, and then underwent inpatient rehabilitation from September 3, 2020, to September 30, 2020. His diagnoses were toxic encephalopathy, anemia, and B12 deficiency. *Id.* at 19. The ALJ noted, however, that "in late 2020 . . . [Claimant] did not describe any poorly controlled fatigue" during visits with his primary care physician and nephrology and neurology consultants. The ALJ does not cite to any medical records in support of that statement; however, the Court's review of the extensive record in this case reveals on the following:

- A note from an October 7, 2020, visit with a primary care physician shortly after Claimant's hospital stay and subsequent stay at a rehabilitation hospital states that Claimant "reports no fatigue." [Dkt 13-9 at 522.]

- A note from an October 28, 2020, follow up with Dr. Gaurav regarding Claimant's chronic kidney diseased does not mention fatigue and notes "no new complaints today." *Id.* at 601. The thoroughness of this note is somewhat suspect, however, in that it states that Claimant has "[n]o hospitalization history," despite Claimant's extensive hospital stay that ended just one month prior to the visit.

- A note from a November 11, 2020, visit with neurologist Susan Sharifi to follow up after his hospitalization notes malaise and fatigue, as well as muscle weakness, numbness, tingling, and decreased balance. *Id.* at 491.

- A note from a November 12, 2020, visit with a primary care physician does not mention fatigue, but does mention continuing balance problems. *Id.* at 524.

The ALJ also stated that Claimant "did not make any regular complaints of . . . fatigue" to his physicians during the first half of 2021. [Dkt. 13-2 at 20.] Again, the ALJ does not cite any medical records for this statement. The Court's review of the record reveals the following:

- A note from a January 12, 2021, primary care visit does not mention fatigue. [Dkt. 13-9 at 527.]

- A note from a February 17, 2021, primary care visit states that Claimant "reports no fatigue." [Dkt. 13-9 at 531.]

- An April 15, 2021, note from Dr. Shah, who was treating Claimant for pernicious anemia and Vitamin B12 deficiency, stated that Claimant "feels much better from before but still continues to have fatigue." [Dkt. 13-10 at 41.]

- A note from a May 20, 2021, visit with Dr. Shah noted "no fatigue." *Id.* at 43.

- In her notes from a June 24, 2021, follow-up visit, Dr. Shah noted that Claimant reported "some fatigue but improved." *Id.* at 45. Dr. Shah further noted that Claimant "feels good." *Id.* at 46. Notes from follow-up visits in July and August 2021 noted "no fatigue." *Id.* at 48, 52. A nurse practitioner also noted no fatigue at follow-up visits in September, October, November, and December 2021, and January and February 2022. *Id.* at 55 (also noting "feeling well"), 57 (also noting "no complaints"), 62 (again noting "no complaints), 65 (also noting "feeling well), 67 (also noting "denies any specific complaints), 71.

Finally, the ALJ noted that Claimant did not report fatigue to Dr. Kiani during his consultative examination. *See* [Dkt. 13-2 at 20] (citing [Dkt. 13-9 at 481]).

An ALJ "must competently explain an adverse credibility finding with specific reasons 'supported by the record,'" *Engstrand v. Colvin*, 788 F.3d 655, 660 (7th Cir. 2015) (quoting *Minnick v. Colvin*, 775 F.3d 929, 937 (7th Cir. 2015)), and build an "accurate and logical bridge between the evidence and conclusion." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). The Court's review of an ALJ's subjective symptom evaluation is generally deferential unless "if, after examining the ALJ's reasons for discrediting testimony, we conclude that the finding is patently wrong." *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010).  Here, the ALJ provided specific reasons that are supported by the record for not fully crediting Claimant's claim of disabling fatigue.  The ALJ's reading of the overall medical evidence with regard to fatigue is not patently wrong.  Indeed, as set forth in detail above, the records from the healthcare providers who treated Claimant for pernicious anemia indicate that Claimant's fatigue improved with treatment and then was eliminated.  The Court therefore finds no reversible error with regard to the ALJ's consideration of Claimant's fatigue.

## B. ALJ's Reliance on State Agency Consultants

During Claimant's 2020 hospitalization, he underwent a cervical spine MRI that revealed "multilevel degenerative changes . . . at the cervical spine contributing to multilevel thecal sac compression and neural foraminal narrowing." [Dkt. 13-7 at 523.] This included mild to moderate bilateral neural foraminal narrowing at C3/C4; moderate left neural foraminal narrowing at C4/C5; moderate right neural foraminal narrowing at C6/C7; moderate to severe right neural foraminal narrowing at C4/C5; and moderate to severe bilateral neural foraminal narrowing at C5/C6.  *Id.*  The ALJ acknowledged the MRI results and determined that one of Claimant's severe impairments was degenerative disc disease of the cervical spine.

Claimant argues that remand is required because it appears that the state agency physicians, whose opinions the ALJ found "rather persuasive," failed to consider the cervical spine MRI, and that the ALJ's consideration of the effect of the MRI results on Claimant's RFC is not otherwise based on any medical evidence.  The Court agrees.  While it appears that the MRI report was included in the medical evidence that was sent to the state agency physicians, it was, as Claimant points out, one page among many hundreds, with the remaining documents being "overwhelmingly devoted to medical conditions unrelated to cervical spine degenerative disc disease" which "makes sense, given that [Claimant] faced a life-threatening acute neurological illness that required months of hospitalization and rehab followed by further follow-up evaluation of any lingering neurological/neurocognitive deficits."  [Dkt. 15 at 15.]  The state agency consultants do not mention either the MRI report or degenerative disc disease of the cervical spine; the most logical explanation for that fact is that they did not notice it.

The Commissioner argues that this is not a problem "because the ALJ provided substantial support for the decision outside of her consideration of [the state agency consultants'] findings."  [Dkt. 17 at 7.]

> In addition to considering the prior administrative medical findings, the ALJ here (1) found degenerative disc disease to be a severe impairment; (2) specifically considered the MRI of Plaintiff's neck; (3) considered whether the impairment meets listing § 1.15; (4) and acknowledged Plaintiff's complaints of chronic neck pain and difficulty reaching, lifting, and carrying (Dkt. 13-2 at pp. 14-18, R. 13-17).  But the ALJ also provided a review of the medical evidence post-dating the neck MRI, and this evidence supported Plaintiff's ability to perform the lifting, carrying, and reaching requirements of light work.  Specifically, the ALJ noted that Plaintiff had full strength and range of motion along his spine at the consultative exam, he did not complain to providers of any musculoskeletal pain, and he was observed with normal sensation, strength, and reflexes in his shoulders and arms (Dkt. 13-2 at pp. 19-21, R. 18-20; see Dkt. 13-9 at pp. 482, 487, 492, R. 2062, 2067, 2072).  Significantly, Plaintiff did not complain to any provider about neck pain or difficulty lifting and carrying, and he has not pointed to any evidence, outside of the MRI that the ALJ already acknowledged, indicating he could not

9

> occasionally lift up to 20 pounds. Indeed, the only evidence suggesting Plaintiff was unable to perform the lifting and carrying requirements of light work comes from his testimony (*see* Dkt. 13-2 at pp. 75-77, R. 74-76). But an ALJ is not required to accept subjective allegations that are unsupported by the medical record. *See Manley v. Barnhart*, 154 F. App'x 532, 536 (7th Cir. 2005) (a "claimant's subjective complaints need not be accepted insofar as they clash with other evidence in the record.").

*Id.* at 7-8. The problem is that the ALJ essentially relied on the opinions from the state agency consultants for her RFC determination, and there is no way for the ALJ, or the Court, to know whether those opinions would have changed if the state agency consultants had considered the cervical spine MRI report. As Claimant points out, if the state agency consultants had considered the MRI report and determined that Claimant was not able to perform light work because of the effects of degenerative disc disease of the cervical spine, and the ALJ had adopted their findings, then a finding of disabled would have been required under the applicable Medical Vocational Guideline. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2 (also referred to as "the Grids").

The ALJ's failure to obtain a medical opinion that included an evaluation of the cervical spine MRI report ran afoul of the Seventh Circuit's holding in *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (ALJ's failure to submit new MRI to medical scrutiny was fatal "since it was new and potentially decisive medical evidence") (citations omitted). Indeed, the Seventh Circuit has noted that that court

> [has] been especially critical of ALJs' attempts to deduce the meaning of MRIs without medical assistance. *See, e.g., McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018); *Goins*, 764 F.3d at 680; *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014). It is also true that even evidence of "mild" changes can be potentially decisive in certain circumstances. *See, e.g., Israel v. Colvin*, 840 F.3d 432, 439–440 (7th Cir. 2016) (ALJ was required to seek an updated opinion regarding an MRI showing "mild," "minor," and "minimal" spinal changes to determine whether it supported the claimant's reports of disabling pain).

10

*Baptist v. Kijakazi*, 74 F.4th 437, 443 (7th Cir. 2023). This case is even more striking; it does not involve the failure to seek medical assistance to assess "mild" or "minor" changes between MRIs, but rather the failure to seek medical assistance to assess an MRI that established the existence of an impairment that was not even acknowledged by the physicians whose opinions the ALJ relied upon.

The Commissioner argues that

> [w]hile the Seventh Circuit has been reluctant to affirm decisions with unreviewed diagnostic imaging, they have clarified recently that remand is not warranted in all circumstances, particularly where the record reflects that a claimant's medical providers saw the imaging and did not provide any treatment or recommend any limitations.

[Dkt. 17 at 8]. However, here the record does not reflect that any of claimant's medical providers saw or considered the MRI report, other than the providers who were treating him for an unrelated, and extremely serious, condition in the hospital. Perhaps in a perfect world (or a perfect healthcare system), Claimant would have been referred to an orthopedic specialist for further evaluation and treatment of his cervical spine condition after his emergent medical condition was under control, but it is hardly surprising that no such referral appears to have been made in this case. Thus, the two cases cited by the Commissioner, *Baptist* and *Bakke v. Kijakazi*, are both readily distinguishable from this case, as in both of those cases the record contained clear evidence that at least one treating physician had reviewed the new imaging scan and commented on it in the medical records. *See Bakke v. Kijakazi*, 62 F.4th 1061, 1067 (7th Cir. 2023) (noting two treating physicians reviewed scan results and "[n]either found it concerning or noted a significant impact on Bakke's functional capacity"); *Baptist*, 74 F.4th at 443 ("When evidence of mild changes is reviewed by a claimant's treating physicians and unaccompanied by

11

any new symptoms, limitations, or treatment recommendations, we cannot say that it changed the picture so much that the ALJ was required to seek an updated opinion to account for it.").

Remand is required so that the ALJ can obtain a medical opinion regarding the effect of the abnormalities noted on the cervical spine MRI report on Claimant's ability to perform work-related functions.

### C. ALJ's Consideration of Claimant's Mild Neurocognitive Disorder

Finally, Claimant argues that the ALJ "committed reversible error by failing to recognize a severe impairment related to mild neurocognitive disorder or to residual effects of toxic encephalopathy." [Dkt. 15 at 21.] As Claimant acknowledges, any such error is harmless "[s]o long as the ALJ accounts for 'all of [a claimant's] severe and non-severe impairments . . . when determining [his] RFC immediately after step 3.'" *Id.* (quoting *Curvin v. Colvin*, 778 F.3d 645, 649 (7th Cir. 2015)). However, it does not appear that the ALJ did so here.

There is no question that Claimant had significant issues with his cognitive functioning while he was suffering from acute toxic encephalopathy in 2020. During Claimant's lengthy hospitalization for that condition, a psychologist examined Claimant and found that he "lack[ed] sufficient cognitive capacity to fully understand information presented and make medical decisions independently." [Dkt. 13-8 at 4.]³ However, on March 3, 2021, Claimant underwent a

---

³ In his brief, Claimant cites (accurately) to a summary of the psychologist's findings that is set forth in the notes of the rehabilitation facility where Claimant was treated immediately after his hospital stay. The Court has tried in vain to locate the original note from the psychologist in the record. However, the summary also notes that the psychologist diagnosed adjustment disorder with depressive moods and recommended that Claimant be put on an SSRI. [Dkt. 13-8 at 4.] Claimant was, in fact, prescribed an SSRI on August 28, 2020, in the midst of his hospital stay, at which time the diagnosis of depression was first noted in the hospital records. *See* [Dkt. 13-7 at 376-77].

consultative mental status exam conducted by Scott Duncan, Ph.D. *See* [Dkt. 13-9 at 513]. Dr. Duncan concluded that Claimant "appears to be of somewhat limited intellectual capacity and reported that he received special education services. He manifested adequate memory, focus, concentration and attention to participate in many work-related endeavors." *Id.* at 516. He further found that Claimant was able to manage his own funds, *id.*, that his "[i]ndependence/ autonomy, comprehension and memory, quality and complexity of endeavors are all adequate," *id.* at 515, and that his "immediate, recent, and remote memory functions were intact," *id.* at 514. This supports the ALJ's finding that the severe cognitive issues caused by Claimant's acute encephalopathy had resolved and that Claimant otherwise had only mild limitations in each of the "paragraph B" criteria. *See* [Dkt. 13-2 at 15] ("The undersigned finds that the claimant has mild limitation in understanding, remembering, or applying information, mild limitation in interacting with others, mild limitation in concentrating, persisting, or maintaining pace, and mild limitation in adapting or managing oneself."). Accordingly, it also supports the ALJ's finding that Claimant's neurocognitive disorder was nonsevere.[4]

The problem is that the ALJ does not explain in her decision why she determined that Claimant's mild cognitive impairment, alone or in combination with his other impairments, did not merit any limitations in his RFC. *See* 20 C.F.R. § 416.945(e) ("[W]e will consider the

---

[4] In his brief, Claimant states that the ALJ "did not even include his neurocognitive disorder in a list of the impairments that she regarded as non-severe," [Dkt. 15 at 21], but that is incorrect. The ALJ listed Claimant's non-severe psychological impairments separately from his non-severe physical impairments, and clearly recognized "mild neurocognitive disorder" as a nonsevere psychological impairment. *See* [Dkt. 13-2 at 15] ("The claimant's medically determinable mental impairments of unspecified depressive disorder, schizoaffective disorder, adjustment disorder, and mild neurocognitive disorder also do not cause more than minimal limitation in the ability to perform basic mental work activities and are nonsevere.").

limiting effects of all your impairment(s), even those that are not severe, in determining your residual functional capacity."). The ALJ acknowledged that Claimant testified that he had memory problems and difficulty focusing or understanding, and that Claimant's uncle stated in a function report that Claimant had difficulty completing tasks. However, the ALJ did not explain why she did not credit this testimony or find that it, along with the other evidence of record, affected Claimant's RFC. This must be corrected on remand.

## V. Conclusion

For the reasons stated above, the Commissioner's decision is **REVERSED** and **REMANDED for further proceedings consistent with this Order**.

SO ORDERED.

Dated: 28 MAY 2024

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Service will be made electronically on
all ECF-registered counsel of record via
email generated by the Court's ECF system.